Filed 4/28/26  P. v. Young CA2/5
Opinion following transfer from Supreme Court

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B331830 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA384433) |
| v. | |
| DESTINY YOUNG, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge.  Affirmed.

Jennifer Hansen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Chief Assistant Attorneys General, Susan Sullivan Pithey, Senior Assistant Attorney General, Charles S. Lee and Michael C. Keller, Deputy Attorneys General for Plaintiff and Respondent.

In 2014, Destiny Young pleaded guilty to two counts of voluntary manslaughter (Pen. Code,[1] § 192, subd. (a)), three counts of robbery (§ 211), and three counts of attempted robbery (§§ 664/211), which she committed with her boyfriend Jabaar Thomas. Pursuant to a plea agreement, Young was sentenced to an aggregate determinate term of 25 years in prison in exchange for her truthful testimony at Thomas's trial.

In 2022, Young filed a petition for vacatur of her two voluntary manslaughter convictions and resentencing pursuant to section 1172.6.[2] Following an evidentiary hearing, the trial court denied the petition because the court found the prosecution had proved beyond a reasonable doubt that Young was guilty of the murders of Marcelo Aragon and Gabriel Ben-Meir under sections 188 and 189 as amended.

On appeal, Young contended that the evidence was insufficient to support the trial court's findings that she was a major participant in the underlying robberies and acted with reckless indifference to human life. A majority of this court

---

[1] All further statutory references are to the Penal Code.

[2] This was Young's second petition for resentencing. The trial court denied her first petition because former section 1170.95 (now § 1172.6) did not apply to manslaughter convictions. This court affirmed the trial court's order. Former section 1170.95 was subsequently amended to include relief for defendants with manslaughter convictions where the defendant accepted a plea offer in lieu of a trial in which the defendant could have been convicted of murder.

affirmed the trial court's order as to both manslaughter convictions.[3]

Young petitioned for review in our Supreme Court. The Supreme Court granted review and deferred further action in the matter pending consideration and disposition of a related issue in *People v. Emanuel*, S280551 (see Cal. Rules of Court, rule 8.512(d)(2)), or pending further order of the court. On June 2, 2025, the Supreme Court filed its opinion in *People v. Emanuel* (2025) 17 Cal.5th 867, 894 (*Emanuel*). On December 17, 2025, the Supreme Court transferred the matter back to this court with directions to vacate the submission and reconsider the case in light of *Emanuel*. We vacated our January 27, 2025 opinion, and the parties filed supplemental briefs. We issue this revised opinion addressing Young's arguments in light of *Emanuel*.

We affirm the trial court's order.

---

[3] Justice Baker dissented in part and concurred in part. With respect to the murder of Aragon, Justice Baker concluded the evidence was insufficient to support the trial court's finding that Young acted with reckless indifference to human life. Justice Baker concurred with the majority that substantial evidence supported the trial court's finding that Young could still be convicted of the murder of Ben-Meir under the laws as amended as a major participant in the robbery who acted with reckless indifference to human life.

## FACTS AND PROCEDURAL HISTORY[4]

### A.   *Facts*

In mid-April of 2011, Young moved into her godmother's house.  She met Thomas at a nearby liquor store on or about April 15, 2011.  Young initially thought Thomas was approaching her to sell her drugs.  The two ran into each other again in the neighborhood after that and quickly became friendly.

Young's godmother told her not the get involved with Thomas.  Young's godmother was wary of Thomas because she had a previous confrontation with him.  Young's godmother also knew Thomas to be violent.  She said Thomas "was a woman beater and a bad person."  Thomas had beaten a woman who Young's godmother knew.  The woman was injured so badly that she had to be "put in the hospital."  Young's godmother also knew that Thomas had a relationship with the woman across the street

[4] The facts are taken from Young's May 2011 police interrogation, her April 2012 preliminary hearing, her June 2013 proffer interview, and her February 2016 testimony at Thomas's trial.  Although the trial court did not specify which documents were admitted into evidence at the evidentiary hearing, the parties agree that these were the sources the court considered in making its ruling.  From our review of the transcripts of the hearing, that appears to be correct.  In light of the parties' agreement, our own review of the transcript of the evidentiary hearing, and the absence of contentions relating to the admission of evidence, we accept the parties' representations.  We note that although Young attached these documents to her evidentiary brief filed with the trial court (see post), they were not included in the record on appeal.  Young moved to augment the record, and we granted her motion in our order of June 21, 2024.

4

and she told Young that she had seen Thomas "get violent" with the woman.

Young disregarded her godmother's advice and continued to see Thomas. The romantic relationship lasted from mid-April to May 11, 2011, when they were arrested. The first week they met they saw each other every day. Their relationship became serious very quickly. Young believed that Thomas loved her. He said that he wanted to marry her and they talked about getting an apartment together.

Thomas did not have an apartment when Young met him; he was staying with his brother. Thomas made money by selling drugs. Young's godmother did not allow Thomas inside her house, so Thomas and Young drove around together a lot while Thomas sold crack. Thomas and Young sometimes slept in Young's car together, or at a hotel, or at "Mama Pat's" house. Mama Pat was an elderly woman who Thomas supplied with drugs. In exchange, Mama Pat allowed Thomas to store his clothing and "cut up" his drugs at her house.

Young first learned that Thomas had a shotgun about a week or two into their relationship. Thomas picked Young up in a rental car. When Young got in, she saw the shotgun on the back seat. Young also saw Thomas's shotgun at Mama Pat's house. Thomas kept the shotgun in a bag under a futon and pulled it out for Young to see. Young let Thomas keep the shotgun in the trunk of her car sometimes.

Young was never afraid of Thomas, but she had "seen him get a pretty good temper[,]" and she knew he was "hot-headed." Young admitted that, during the second week she was dating Thomas (prior to his commission of the murders in the instant case), she saw him "put hands on" the neighbor across the street.

5

Thomas told Young that he had committed multiple robberies during the few weeks they had been dating.  He was very "[n]onchalant" when he said it, "like it didn't matter."  Young was committed to the relationship.  She was willing to aid Thomas in the robberies regardless of what happened.

### 1.    The Aragon Murder

At around 11:00 p.m. on April 30, 2011, Thomas and Young were driving around in his rental car looking for someone to rob.  Young drove and Thomas sat next to her in the front passenger seat with the shotgun concealed inside a bag.  Young was "hoping that [Thomas] wouldn't hurt nobody", but she thought it was possible that Thomas would hurt someone using the shotgun.

Young and Thomas spotted three males walking together.  Young drove past the men.  One man, later identified as Marcelo Aragon, split off from his friends.  Thomas told Young to circle back past Aragon so that Thomas could determine if Aragon was alone and rob him.  Young circled back.  Thomas waited a minute while Aragon's companions continued walking down the road, and then got out of the car with the shotgun.  Young did not try to dissuade Thomas.  She remained inside the car in the middle of the street with the engine running and the lights on.

Young kept a lookout, but intermittently looked back over her shoulder to watch the robbery.  She saw the two men struggling.  It appeared to her that Aragon was attempting to get Thomas's hands off of him.  Thomas was still holding the shotgun.  Young turned away to make sure there were no people or cars in the area.  She heard a gunshot followed by a scream that she described as "close to blood[]curdling", but "louder than

6

that."  When she looked back again, Thomas was "skipping" toward the car with the gun.  Thomas got inside and Young began driving away.  As she did, Young looked back and saw Aragon leaning against a wall.

Young did not ask Thomas whether he shot Aragon and Thomas did not say.  "[T]he way that [Aragon] screamed, [she knew] something had to happen but [she] didn't want to know for sure."  Young just "didn't want to process it."  "It was more convenient for [her] to not to get confirmation . . . ."  She "turn[ed] a blind eye" to the shooting rather than trying to help Aragon or confirm that he had been shot because she wanted to ignore "the bad" and continue dating Thomas.

Thomas did not tell Young to drive him away from the shooting.  She drove away "[b]ecause [she] needed to."  She wanted to "get away from the [violence of the] scene."  Young drove to her godmother's house and got out of the rental car. Thomas drove away.  Thomas stole about $30 from Aragon. Later, Young and Thomas bought alcohol using the money. Aragon died of the gunshot wound.

### 2.  The Ben-Meir Murder

On May 8, 2011, at around 12:00 or 1:00 a.m., Young and Thomas drove around looking for someone to rob using Young's car.  Young drove Thomas to Mama Pat's house to pick up Thomas's shotgun.  Thomas then rode in the front passenger seat of Young's car with the shotgun.  They spotted a man later identified as Gabriel Ben-Meir exiting his car carrying groceries. Ben-Meir started to cross the street.  Thomas told Young to stop, so she drove up a little bit and stopped in the street.  Young was

7

concerned when Thomas got out of the car, but she did not drive away because she knew Thomas would get caught without her help. Young looked back and saw Thomas and Ben-Meir engaged in a struggle. Ben-Meir was down on his knees. She looked away briefly, and when she looked back again Ben-Meir was face-down on the ground with his hands up. Young heard a gunshot. Ben-Meir was lying flat on the ground. Young did not recall seeing Ben-Meir move after the gun shot. Thomas returned to Young's car with Ben-Meir's groceries and the shotgun. Young asked Thomas if he shot Ben-Meir, and Thomas denied it. Young drove them away from the scene. Young said that hearing the gunshot did not bother her because she did not know what actually happened. She did not see Thomas shoot Ben-Meir.[5]

3. **The Robbery Spree Committed with Richard Anderson**

On May 10, 2011, Young and Thomas committed a string of robberies and attempted robberies with Thomas's friend, Richard

---

[5] Young's version of the facts changed over time. When she was initially arrested she said Thomas borrowed her car a few times, and intimated that he may have used her car in a robbery without her knowledge. Young told police she knew Thomas had taken money from random people on the street. Thomas told her about the street robberies, but he did not say anything specific. He would just come back with money and say, " 'I got somebody.' " Thomas never said that he had used a shotgun. Young told the police she thought it would be stupid of Thomas to walk down the street with the gun. Young denied that she had ever been with Thomas while he was committing a robbery.

Anderson. Young drove the group from location to location in her car throughout the day and into the night. They robbed and/or attempted to rob two liquor stores, a donut shop, and four individuals on the street. The robberies/attempted robberies of the individuals included three separate incidents—the robbers targeted a lone man, a couple, and a lone woman on the street after dark. Thomas picked the targets and directed Young to drive to various locations; Young drove; and Anderson, armed with Thomas's loaded shotgun, approached and threatened the intended victims and took any items they surrendered. When Anderson attempted to rob the lone man, Young heard a gunshot. Anderson ran back to the car and Young drove them away from the scene. Young said that she was "shocked that the gun went off." Young was concerned someone might have been shot and she knew that it may have happened, but she did not ask Anderson if anyone had been hurt. Thomas asked Anderson what happened, but Young claimed she could not remember Anderson's response.

At the proffer, a deputy district attorney questioned Young regarding her state of mind after she heard the gunshot:

> "[Q.] . . . [A]re you thinking to yourself, all right, that's it, I don't want to—we, our luck has run out, I don't want anybody to be hurt, I'm done with this. Did you think that at all?
> "[A.] No.

Young was more forthcoming at the proffer and in her testimony at Thomas's trial, and the majority of the facts were gleaned after her preliminary hearing testimony.

"[Q.] No, 'cause you went on and did another robbery with [Thomas and Anderson], right? Did you at any point say to them look, if you guys want to use the car, take the car, but I'm out. I don't want any part in this.

"[A.] To . . . Remove myself? No.

"[Q.] Why not?

"[A.] I can't honestly answer that."

"¶ . . . ¶

"[Q.] What were you getting out of this is what I'm asking—what were you getting out of being there with [Thomas and Anderson]?

"[A.] The time that I had with [Thomas], to be honest. I mean, that was the whole thing that I was looking at. I mean, I, I wasn't really paying attention to what was going on—I was just going along with it. I mean, I—that's as honest as I can be. I can't say that, you know, I was even in—thinking about what was going on."

The day after the robbery spree, Young was arrested in connection with the crimes.

## B. *Petition for Resentencing*

In May 2022, Young filed a petition for resentencing utilizing a standard form. The court appointed counsel.[6]

---

[6] The court directed the People to respond and/or appear at the next scheduled hearing. The People did not file a response, but appeared at all proceedings.

The court ordered copies of the record in Young's first section 1170.95 petition for resentencing, the "plea transcript," and Young's testimony at former codefendant Thomas's trial.

Following a hearing on the matter, the court found Young prima facie eligible for relief under section 1172.6 and issued an order to show cause.

In June 2022, Young filed an evidentiary brief, contending that she could not be found guilty of the murders under sections 188 and 189 as amended because she was not a major participant in the underlying robberies who acted with reckless indifference to human life.  Young also contended that the People had violated her right to due process by making arguments that were inconsistent with the position the People took at Thomas's trial.

Attached to the brief were transcripts of Young's May 2011 interview with police; transcripts of Young's April 2012 preliminary hearing testimony; transcripts of Young's June 2013 proffer; a copy of Young's March 2014 cooperation agreement with the District Attorney; transcripts of Young's testimony at Thomas's trial in February 2016; the prosecution's arguments at Thomas's trial; and Dr. Nancy Kaser-Boyd's 2023 psychological evaluation of Young based on an evaluation she conducted in 2013.

C.      *Section 1172.6 Evidentiary Hearing*

At the evidentiary hearing, the People argued that Young was a major participant in the robbery of Aragon who acted with reckless indifference to human life, and that she could still be convicted of murder under the current laws.

11

Defense counsel argued that the prosecutor had taken a very different view at Thomas's trial, and depicted Young as minimally involved and pathetic in her desire to be loved. Young was characterized as an unsophisticated driver who took direction from Thomas. Counsel emphasized that Young had not seen Thomas kill either of the victims and did not know anyone had died until her interview with police. It may have been willful ignorance on her part, but not reckless indifference. Counsel asserted that Young had only known Thomas for two weeks before he killed Aragon, and she had not witnessed Thomas being violent. Although her godmother told her Thomas was a " 'woman-beater,' " Young had never personally seen that side of him. Young was suffering from mental disorders that caused her to deny that reality.[7] She was drinking hard liquor daily. Young's mental disorders prevented her from being a restraining influence. She never left the vehicle and never told Thomas to shoot anyone. Young's participation in a garden variety armed robbery where death was possible was insufficient to establish reckless indifference.

---

[7] At the hearing, the defense called Dr. Kaser-Boyd to testify regarding Young's mental disorders. The prosecutor objected on relevance grounds. The trial court permitted the testimony insofar as it related to the issue of reckless indifference to human life. We do not include a recitation of Dr. Kaser-Boyd's testimony here, as neither party mentions it on appeal and it does not appear to have factored into the trial court's decision.

## D.     *Trial Court's Ruling*

The trial court found Young not credible.  The court stated that Young continually minimized her role and had a "selective memory."  What Young remembered and what happened changed depending on her "status."  The court specifically rejected Young's story that she did not know the victims had been shot and/or killed.  As to both victims, the trial court found that Young was guilty under the current laws of felony murder as a major participant in the underlying robberies who acted with reckless indifference to human life.

The trial court found that Young and Thomas "were partners in crime and lovers. . . . [T]hey talked about their crimes, despite her denial.  She's not credible as to this."  Young and Thomas looked for potential victims together.  The court inferred that the couple discussed what type of victim they wanted to rob and that Young drove in a manner that facilitated the crimes.  The court stated, "It is a reasonable inference that she was dating this man, living with him, that she discussed with him the plans to commit the numerous robberies. . . . [¶]  It's, to me, not realistic to believe that they just went out and were driving around, and he says, 'stop,' and he gets out.  They talked about it."  The court observed that Young consistently stated that she acted voluntarily.

The court found not credible Young's testimony that she did not know Thomas would commit these violent robberies.  Young knew Thomas was prone to violence and had committed violent robberies before she participated in either crime with him.

13

Young was present in both robberies. She was not like the getaway driver who is parked a distance down the street. Young was idling at the scene of the crime so that Thomas could jump out, rob a victim, and immediately jump back in the car and leave. She was approximately 10 to 20 feet away when the murders were committed. The court found Young's presence significant, because without her presence Thomas could not have pulled off the robberies. Young was present for all stages of the crimes—planning, execution, flight, and dividing the spoils.

The court stated that it defied common sense that Young heard a shotgun blast, saw Aragon stumble away and brace himself against a wall, and yet did not know he was shot. Young knew Thomas had shot Aragon and that Thomas was willing to use violence to rob people. She saw Ben-Meir begging on the ground.

The court found that Young had an opportunity to restrain Thomas or aid the victim in both instances. She could have told Thomas to get back into the car or she could have driven away. Young could have aided the victim at the scene or called 9-1-1, but she did neither.

With respect to the murder of Ben-Meir, the trial court additionally found that Young was guilty of malice murder because she acted with intent to kill, or alternatively, she was guilty because she acted with implied malice.[8]

---

[8] Because we conclude that Young was a major participant who acted with reckless indifference to human life in both robberies, we need not address whether substantial evidence supports the trial court's finding that she acted with implied malice or intent to kill in Ben Meir's murder.

# DISCUSSION

## A.  *Legal Principles*

### 1.  Section 1172.6

Effective January 1, 2019, the Legislature amended sections 188 and 189 "as to the 'felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Sen. Bill No. 1437 (2017–2018 Reg. Sess.); Stats. 2018, ch. 1015, § 1, subd. (f).)  As amended, the law defining malice provides that except for first degree felony murder, 'in order to be convicted of murder, a principal in a crime shall act with malice aforethought. . . .' [Citations.]" (*People v. Basler* (2022) 80 Cal.App.5th 46, 54, fn. omitted.)

Pursuant to section 1172.6, subdivision (a), a person convicted of manslaughter by plea may file a petition to have the manslaughter conviction vacated and to be resentenced if "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, . . . .  [¶] (2) The petitioner was convicted of . . . manslaughter [after] . . . accept[ing] a plea offer in lieu of a trial at which the petitioner could have been convicted of

15

murder . . . . [and] [¶] (3) The petitioner could not presently be convicted of murder . . . because of changes to [s]ection 188 or 189 made effective January 1, 2019."

If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the trial court must issue an order to show cause.  If an order to show cause issues, the court then "hold[s] a hearing to determine whether to vacate the . . . manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts," unless the parties "waive a resentencing hearing and stipulate that the petitioner is eligible to have [his or her] . . . conviction vacated and to be resentenced."  (§ 1172.6, subd. (d)(1)–(2).)  "At the hearing . . . the burden of proof . . . [is] on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder . . . ."  (§ 1172.6, subd. (d)(3).)

On appeal from a trial court's order denying a section 1172.6 petition following a subdivision (d)(3) hearing, this court evaluates the sufficiency of the evidence supporting the court's determination using the substantial evidence standard of review. (*People v. Garrison* (2021) 73 Cal.App.5th 735, 747.)  " '[W]e look to whether the prosecution has introduced sufficient evidence of " ' "reasonable, credible, and of solid value" ' " to "support a finding beyond a reasonable doubt" ' that petitioner was guilty. ([*People v.*] *Clark* [(2016)] 63 Cal.4th [522,] 618 [(*Clark*)].)" (*People v. Henley* (2022) 85 Cal.App.5th 1003, 1017 (*Henley*).) "We examine the record in the light most favorable to the judgment and defer to the trial court's implicit credibility findings.  [Citation.]  ' "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the

[fact finder]'s verdict." ' [Citation.]" (*People v. Diaz* (2026) 118 Cal.App.5th 545, 558.)

### 2. <u>Felony Murder</u>

"Under the amended felony-murder rule, a defendant who was not the actual killer and did not act with the intent to kill can only be liable for murder if [the defendant] was a major participant in the underlying felony and acted with reckless indifference to human life. [Citations.] '[T]he standard under section 189, subdivision (e)(3) for holding . . . a defendant liable for felony murder is the same as the standard for finding a special circumstance under section 190.2[, subdivision] (d), as the former provision expressly incorporates the latter.' [Citation.] Accordingly, death penalty cases interpreting section 190.2, subdivision (d), including *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *Clark*, *supra*, 63 Cal.4th 522, are controlling . . . ." (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 123.)

#### a. *Major Participant*

In determining whether the defendant was a major participant in the underlying felony, "the ultimate question [is] whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' [Citations.]" (*Banks*, *supra*, 61 Cal.4th at p. 803.) To determine whether a defendant was a major participant in the underlying felony, we consider multiple factors, including: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role

did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Ibid.*, fn. omitted.) "No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Ibid.*)

b.      *Reckless Indifference*

"Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' [Citations.] 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement." (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).) To determine whether defendant had the requisite

18

mental state, "[w]e analyze the totality of the circumstances" in a manner that largely overlaps with our major participant discussion. (*Id.* at pp. 676–677.) As our Supreme Court has explained, " '[a]lthough we state these two requirements separately, they often overlap,' " " 'for the greater the defendant's participation in the felony murder, the more likely that he [or she] acted with reckless indifference to human life.' [Citation.]" (*Clark, supra*, 63 Cal.4th at p. 615.)

"In *Clark, supra*, 63 Cal.4th at pages 618 through 622, the California Supreme Court established a five-factor test for whether a defendant acted with reckless indifference to human life. . . . [N]o one factor is necessary, nor is any necessarily sufficient." (*Henley, supra*, 85 Cal.App.5th at pp. 1015–1016.) The factors we consider are: (1) use or awareness of the presence of weapons; (2) duration of the crime; (3) efforts taken to minimize violence; (4) knowledge of a cohort's likelihood of killing; and (5) physical presence at the scene and opportunity to restrain confederates or aid victims. (*Emanuel, supra*, 17 Cal.5th at pp. 885–895.)

### c. *People v. Emanuel*

In *Emanuel, supra*, 17 Cal.5th 867, our Supreme Court clarified what factual scenarios can support a finding of reckless indifference to human life. There, Louis Emanuel and codefendant Jacob Whitley met John Sonenberg, the victim, on a residential street abutting a public park at approximately 3:06 p.m., ostensibly to buy marijuana from Sonenberg. (*Emanuel, supra*, 17 Cal.5th at pp. 876–877.) The transaction was brief and ended in Sonenberg's death. At approximately 3:15 p.m.,

witnesses heard a gunshot and screeching tires. (*Id.* at p. 877.) One person saw a truck moving perpendicular to the street at high speed. (*Ibid.*) The truck stopped on the sidewalk with its tailgate against a tree. (*Ibid.*) The engine was still running and the driver's door was open. (*Ibid.*) Sonenberg was lying face down on the ground. (*Ibid.*) A forensic pathologist testified that the cause of Sonenberg's death was a close-range gunshot to the side of his neck. (*Ibid.*) Sonenberg sustained an abrasion to his forehead consistent with blunt force trauma. (*Ibid.*)

Breanna Santos, Emanuel's former girlfriend, told officers that Emanuel told her that he and Whitley went to the park to get marijuana from Sonenberg. (*Emanuel*, *supra*, 17 Cal.5th at p. 878.) Emanuel said that " ' "[Sonenberg] wasn't trying to give it up." ' " (*Ibid.*) Emanuel started to walk away and said to Whitley, "[L]et's go." (*Id.* at p. 879.) Whitley would not leave and Sonenberg would not let go of the drugs. (*Id.* at pp. 878–879.) Whitley hit Sonenberg in the head with a gun, but was not able to knock Sonenberg out. (*Ibid.*) Sonenberg started fighting back. (*Ibid.*) Whitley aimed the gun at Sonenberg's leg, but Sonenberg pushed the gun up. (*Ibid.*) Whitley fired and hit Sonenberg in the neck. (*Ibid.*) Emanuel panicked and left the scene. (*Id.* at p. 879.)

Destinee Kindle, who was in a relationship with Whitley at the time of the murder, testified that Whitley showed her a news story about the shooting and said he and Emanuel were involved. (*Emanuel*, *supra*, 17 Cal.5th at p. 879.) Whitley told Kindle that he was trying to rob Sonenberg for marijuana and accidentally shot Sonnenberg in the neck when he was aiming for Sonenberg's foot. (*Ibid.*)

20

Emanuel was convicted of first degree felony murder as a non-shooter under the former felony murder law. (*Emanuel*, *supra*, 17 Cal.5th at p. 879.) In 2018, he filed a petition for resentencing under former section 1170.95. (*Id*. at p. 881.) The trial court found Emanuel prima facie eligible for relief, issued an order to show cause, and held an evidentiary hearing. (*Ibid*.) Following the hearing, the trial court denied Emanuel's petition. (*Ibid*.) Although the trial court found there was no evidence that Emanuel either knew Whitley was armed or likely to use lethal force, it found Emanuel " 'created' the situation by participating in the robbery, and thus, had an affirmative obligation to do more than withdraw his aid and support from a murderous cohort." (*Ibid*.)

Emanuel appealed. He conceded that he was a major participant in the robbery, but argued that the evidence was insufficient to support the finding that he acted with reckless indifference to human life. (*Emanuel*, *supra*, 17 Cal.5th at p. 881.) The Court of Appeal adopted the trial court's reasoning and affirmed the court's order. (*Ibid*.) The Court of Appeal reasoned that as someone who participated in the planning of the robbery and intended to benefit from it, Emanuel could have prevented the robbery from occurring or could have done more to prevent the shooting. (*Ibid*.)

The Supreme Court granted review and reversed. (*Emanuel*, *supra*, 17 Cal.5th at pp. 881, 896.) In so doing, the high court emphasized: " 'The degree of risk to human life is crucial to the analysis.' [Citation.] As the United States Supreme Court has acknowledged, ' "the possibility of bloodshed is inherent in the commission of any violent felony," ' such that one who perpetrates or attempts to perpetrate such a crime may

21

well anticipate 'the use of lethal force as a *possibility*.' [Citation.] Were that degree of culpability sufficient, however, it would amount to ' "little more than a restatement" ' of the former felony-murder rule that Senate Bill No. 1437 retired. [Citation.]" (*Id.* at p. 884.) "This Court has thus made clear that participation in a ' "garden-variety armed robbery," ' i.e., one in which the only factor supporting a reckless indifference finding is that a participant was armed with a gun, is insufficient without more to establish reckless indifference. [Citations.]" (*Ibid.*)

The Supreme Court found that the first and fourth factors—knowledge and use of weapons and knowledge of a codefendant's likelihood of killing—were entirely absent in Emanuel's case. (*Emanuel, supra,* 17 Cal.5th at p. 885.) There was no evidence that Emanuel knew that Whitley possessed a gun, knew that Whitley brought the gun to the robbery, or knew that Whitley was likely to use lethal force. (*Ibid.*)

The Supreme Court also observed that neither the trial court nor the Court of Appeal had addressed the second factor—duration of the crime. (*Emanuel, supra,* 17 Cal.5th at p. 886.) The high court stated that the robbery and murder were of short duration—likely under 12 minutes. (*Ibid.*) Significantly, "[t]here was no prolonged period of restraint, and the interaction appears to have been nonviolent until Sonenberg refused to relinquish the marijuana." (*Ibid.*) At that point, Emanuel had told Whitley "[L]et's go." and started walking away. (*Ibid.*) The court concluded the second factor was neutral, as "it did nothing to heighten the risk of violence beyond that inherent in the robbery itself." (*Ibid.*)

Regarding the third factor—efforts taken to minimize the risk of violence—the Supreme Court held that the trial court

incorrectly found that, although " 'the commission of the crime during daylight hours in public view may have had the potential for minimizing violence . . . .' " " 'there was no evidence that the robbery was planned for that time or planned for that time or that it was planned to occur at that time for the purpose of minimizing risk of violence' ". (*Emanuel, supra*, 17 Cal.5th at p. 887.) The Supreme Court disagreed, stating that Whitley and Emanuel had arranged to meet Sonenberg at the park at 2:30 p.m. (*Ibid*.) There was no requirement that there be direct evidence that there was a plan to minimize violence; circumstantial evidence was sufficient. (*Ibid*.) The Supreme Court reasoned that Emanuel's plan to commit the robbery during daylight hours in a public place where there might be witnesses indicated an effort to minimize violence, and did not support a finding of reckless indifference. (*Ibid*.) The Supreme Court observed that in finding "Emanuel 'had an opportunity to minimize the risk of violence during the robbery itself but failed to do so,' " the lower courts had conflated the third factor with physical presence at the scene and the opportunity to restrain cohorts or aid victims. (*Ibid*.) The court clarified the third factor analysis, stating that "the need to minimize the risk of violence is ' "less pressing" ' when the planned crime does not involve ' "the use of weapons." ' [Citation.] ' "This fact is, by itself, a significant step towards minimizing the likelihood that the plan would result in a 'grave risk of death.' " ' [Citation.]" (*Ibid*.) "Where an 'objective evaluation of the circumstances' of the crime suggests the risk of violence is grave, the defendant's apparent efforts to minimize that risk may be unavailing. [Citation.] Conversely, the absence of such efforts does not necessarily evince a subjective disregard for risk where the objective circumstances of

23

the planned crime suggest the risk of violence posed is no more than that inherent in any violent felony. [Citation.] In such a case, then, the absence of efforts to minimize the risk of violence cannot be said to weigh in favor of a finding of reckless indifference. This applies all the more so when the planned crime does not involve the use of weapons." (*Id.* at p. 888.) Additionally, the third factor does not include consideration of whether the defendant was able to prevent the robbery from occurring. (*Id.* at pp. 888–889.) Finally, regardless of whether the circumstances reflect an effort to minimize violence, the circumstances impact evaluation of "the objective risk of violence posed by the crime and reasonably anticipated by the perpetrator," and whether that risk is greater than that in any violent felony. (*Id.* at p. 889.)

With respect to the fifth factor—physical presence at the scene and opportunity to restrain the violence or aid the victim—the court explained that proximity becomes relevant when a codefendant makes his intent to inflict violence clear, and the defendant has an opportunity to do something to prevent that violence. (*Emanuel, supra*, 17 Cal.5th at pp. 889–893.) In such cases, " 'the murder is a culmination or a foreseeable result of several intermediate steps, or where the [co-]participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force." (*Id.* at p. 889.) As examples, the court cited count-downs and warning shots. (*Id.* at pp. 890, 892.) In Emanuel's case, he told Whitley "[L]et's go." and began walking away. "When met with resistance, Emanuel abandoned the plan rather than resort to greater violence." (*Id.* at p. 891.) The lower courts had not properly credited this evidence, instead concluding that Emanuel could have done more.

(*Ibid*.)  The Supreme Court held that "[t]he focus should not be on the ultimate *efficacy* of his actions, but on what his actions reveal about his mental state."  (*Ibid*.)  Where violence escalates quickly, there may not be an opportunity to intervene.  A failure to intervene should not weigh in favor of a finding of reckless indifference if there is not an opportunity to do so.  (*Id*. at p. 892.)  Emanuel had no real opportunity to intervene as the violence occurred quickly and without warning.  (*Ibid*.)

The Supreme Court acknowledged that "a defendant's conduct following the use of lethal force may be reflective of his or her mental state during the offense," but clarified that flight from the scene without rendering aid to the victim may or may not evince indifference.  (*Id*. at p. 893.)  In Emanuel's case, the crime was committed in a public place in the middle of the day, which increased the odds that other people would aid Sonenberg and that Emanuel and Whitley would be caught.  (*Id*. at p. 894.)  Under the circumstances it was hard to discern Emanuel's state of mind from his flight.  (*Ibid*.)  "While postflight conduct may shed light on a defendant's state of mind, conduct temporally removed from the violent act must clearly evince a culpable mental state."  (*Ibid*.)  "However contemptible we may find a defendant's conduct following a killing, the governing standard is not satisfied by evidence that the defendant was generally indifferent to the fact that someone *has been* killed; it requires evidence that, at the time of the shooting, the defendant acted with indifference toward the grave risk that someone *could be* killed.  Though the former may be evidence of the latter, it is insufficient, standing alone, to support murder liability."  (*Id*. at p. 895.)  As an example of postflight behavior evidencing indifference, the court cited *Tison v. Arizona* (1987) 481 U.S. 137,

151. In *Tison*, one victim survived the shooting, but the defendants disabled the victims' vehicle and abandoned them in the dessert, virtually ensuring death. (*Ibid*.) Emanuel took no actions after Whitley shot Sonenberg to prevent Sonenberg from receiving aid. (*Ibid*.)

Viewing the totality of the circumstances, the Supreme Court concluded that nothing about the planned robbery in Emanuel's case elevated the risk to human life beyond that in any armed robbery—there was no evidence that Emanuel knew Whitley had a gun or a propensity for violence. (*Emanuel*, *supra*, 17 Cal.5th at pp. 895–896.) Moreover, Emauel's failure to do everything possible to prevent the shooting and aid Sonenberg was not sufficient to demonstrate indifference, and his flight from the scene could be equally attributable to disregard or fear. (*Id*. at p. 896.)

## B. *Analysis*

### 1. **The Aragon Murder**

#### a. *Major Participant in the Robbery*

With respect to the first factor when evaluating major participation—Young's role in planning the offense—the trial court found not credible Young's testimony that she merely drove around and Thomas told her what to do. The court stated that the two "were partners in crime and lovers." The record supports the trial court's inference that Young was a partner in the crimes. Although the relationship was new, it advanced rapidly. By the time of Aragon's murder, Young and Thomas were together day

26

and night and discussing marriage. Young played a part in Thomas's criminal activities. She drove Thomas around the neighborhood to sell crack and went with him to Mama Pat's where he "cut up" his drugs. Given the intensity of the relationship and the extent to which Young was already involved in Thomas's criminal activities, the court rationally inferred that the two discussed the robberies.

Contrary to Young's assertions, her role went "beyond that of 'an ordinary aider and abettor to an ordinary felony murder.' " Young drove Thomas around the neighborhood searching for a target, she acted as a lookout and getaway driver, and she shared in the spoils of the robbery, drinking the alcohol that she and Thomas purchased with money Thomas took from Aragon. Young did not simply drive to a pre-determined location, park down the street out of view, and wait for Thomas to return. She kept the car running only feet away from the scene. Young's participation was critical to both locating and stealthily approaching Aragon. The sawed-off shotgun was difficult to conceal due to its size. Young recognized this and told officers it would be stupid of Thomas to walk down the street with it. Without her assistance, Thomas would have a difficult time catching victims off guard because of the shotgun. The shotgun would also be difficult to conceal following a robbery. Young acknowledged this as well—she stated that she did not drive away because she knew if she did Thomas would get caught. Young's role in Aragon's robbery was significant and weighs against her.

As to the second *Banks* factor, there was no evidence that Young provided Thomas with the shotgun, but she knew that

Thomas had the shotgun and that it was loaded. This factor also weighs against her.

Regarding the third *Banks* factor, Young was fully aware that Thomas had a history of violence. Her godmother warned her to stay away from him when they first met and banned Thomas from coming into her house because he had beaten a woman so badly that the woman had to be "put in the hospital." Prior to the Aragon robbery, Young saw Thomas "put hands on" a neighbor. The third factor weighs against Young.

As to the fourth factor—was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?—Young was only a short distance away and watched the robbery transpire. She saw the men struggling, but did nothing to prevent further violence. Young observed that Thomas was holding the shotgun and Aragon was attempting to free himself. Instead of attempting to deescalate the conflict by telling Thomas to leave, or alternatively leaving in the running car to seek help, Young stood guard, scanning the area to ensure that no one else was witnessing the robbery, and waiting to assist Thomas in his escape. The trial court found that Young knew Thomas shot Aragon, based on Young's statements that she heard the shotgun fire and a louder than blood-curdling scream, and then saw Aragon slumped against a wall. Young consistently stated and testified that she was not afraid of Thomas and that she was not forced into doing anything—she was in the relationship no matter the consequences. In short, Young could have encouraged Thomas to leave or she could have abandoned Thomas and sought help when things started to become dangerously violent, but she chose not to.

Regarding the fifth *Banks* factor—Young's actions after the force was used—Young knew that Aragon had been shot, but she did nothing to assist him. Instead, she drove Thomas away from the scene because it was "more convenient" for her to avoid acknowledging that Thomas shot and likely killed Aragon.

Substantial evidence supports the trial court's finding that Young was a major participant in the Aragon robbery.

b.      *Reckless Indifference to Human Life*

With respect to the reckless indifference inquiry, the Aragon murder is not analogous to the murder in *Emanuel*, *supra*, 17 Cal.5th at p. 876. Significantly, there was no evidence that Emanuel knew Whitley possessed a gun or that he knew Whitley brought a gun to the robbery, and there was no evidence that Emanuel knew Whitley was likely to use lethal force. In contrast, Young knew that Thomas planned to use a shotgun, and that it was loaded. Moreover, Young's willingness to have the shotgun in the car when she was driving increased the risk of gun violence. The shotgun was bulky and hard to conceal. Had Young not assisted Thomas by transporting the shotgun, Thomas may not have been able to use a lethal weapon to rob Aragon. Unlike Emanuel, Young knew that her partner had a propensity for violence. She was told Thomas had beaten a woman so badly that the woman had to be hospitalized, and Young had witnessed Thomas physically assaulting a neighbor. Young said she was concerned that Thomas would use the gun to harm someone—i.e.,

she believed Thomas would shoot a victim in order to commit a robbery.[9]  Both of these factors weigh heavily against Young.

The Aragon robbery was similar to the robbery in *Emanuel* in that it was very brief in duration.  In this case, as in *Emanuel,* the duration of the encounter did not increase the risk to the victim, and is a neutral factor.

With respect to efforts taken to minimize the risk of violence, in *Emanuel* our Supreme Court clarified that this factor focuses on efforts that were taken to minimize the risk prior to commission of the crimes.  Emanuel planned for the robbery to take place in the middle of the day in a public place.  The Supreme Court observed that the fact that Emanuel was not aware of weapons or know that Whitley had a propensity for violence made "the need to minimize the risk of violence . . . ' "less pressing[.]" ' " (*Emanuel, supra,* 17 Cal.5th at p. 887.)  In the Aragon robbery, the opposite was true—Young knew that Thomas had a history of violence and was armed with a loaded weapon—the need to minimize the risk was therefore pressing.  The robbery was committed late at night after Thomas and Young ensured that Aragon's companions would not be present to aid him during or after the robbery.  Despite Young's awareness of these circumstances, there is no evidence that she made an effort to minimize the risk of violence.  Rather, as Thomas suggested, Young drove past Aragon and circled back to ensure that Aragon was isolated.  Young did not insist that Thomas

_____

[9] Young's statement that she "hoped" Thomas would not hurt anyone with the gun does not assist her.  Young knew that the robbery had a real potential to include a shooting but decided to participate despite the serious risk to human life that a shooting would pose.

unload the shotgun before robbing Aragon or suggest any other precaution. This factor supports the trial court's finding that she acted with reckless indifference to human life.

Like Emanuel, Young was present at the scene. Our Supreme Court has counseled that " '[p]roximity to the murder and the events leading up to it may be particularly significant where . . . the [co]participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, "the defendant's presence allows [her] to observe [her] cohort[] so that it is fair to conclude that [she] shared in [his] actions and mental state. . . . [Moreover,] the defendant's presence gives [her] an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders." ' (*Clark*, *supra*, 63 Cal.4th at p. 619.)" (*Emanuel*, *supra*, 17 Cal.5th at p. 887.) Young stopped the vehicle only after Aragon was isolated, and she stayed within view of the robbery and watched the robbery unfold. She saw Thomas and Aragon engaging in a physical struggle before Thomas fired the shotgun. As was the case in *Emanuel*, Young did not have a significant amount of time to intervene, but she could have exhorted Thomas to leave with her, as Emanuel encouraged Whitley to do. She also could have driven off, which would both remove her from the situation and perhaps create uncertainty that would allow Aragon to escape. At best, this factor is neutral, considering the fact that Young had a short time in which to react. It is notable, however, that Emanuel acted in a similarly short timeframe, whereas Young did not.

31

Young's subsequent behavior also demonstrates indifference. The trial court rationally inferred that, given what she knew and witnessed, Young knew that Thomas shot and likely killed Aragon. This did not dissuade Young from participating in the robbery in which Ben-Meir was killed; nor did it dissuade Young from participating in an extensive robbery spree involving the shotgun only days after the Ben-Meir murder. When Young heard the shotgun fire while Anderson was robbing an individual on the street, she was still not deterred, but went on to participate in other street robberies.

c.    *Totality of the Circumstances*

Analyzing the totality of the circumstances, the Aragon robbery was not a " ' "garden-variety armed robbery," ' " in which the only factor supporting reckless indifference is the fact that a participant is armed with a gun. (*Emanuel*, *supra*, 17 Cal.5th at p. 884.) Young was aware that Thomas was violent and armed with a loaded gun. The robbery took place at night, after Thomas and Young assured that Aragon was isolated—Aragon's friends would not be present to assist him during the robbery and would be less likely to know that he needed medical attention afterwards. Young did not suggest any modifications that would have lowered the risk of Aragon's death, such as insisting that Thomas unload the gun. She did not encourage Thomas to leave when she saw the men struggling or remove herself from the situation. She heard the gunshot and Aragon's louder than blood-curdling scream and saw Aragon slumped against a wall, but she did not make any effort to help him. Young did not refuse to participate in robberies with Thomas after Aragon was

32

shot. She assisted in the robbery in which Ben-Meir was shot and killed and then assisted in a spree of robberies in which Anderson used and fired the shotgun. Her crimes ended only with her arrest.

Substantial evidence supports the trial court's findings that Young was a major participant who acted with reckless indifference to human life in the Aragon robbery. As such, she could still be found guilty of felony murder under sections 188 and 189 as amended on January 1, 2019.

## 2.  **The Ben-Meir Murder**

### a.  *Major Participant in the Robbery*

The same factors that weighed against Young in the robbery of Aragon provide substantial evidence that Young was a major participant in Ben-Meir's robbery. We will not recount the factors common to both robberies in depth, but instead discuss additional evidence of Young's participation in the Ben-Meir robbery.

Young's role in the Ben-Meir robbery was even greater than her role in Aragon's. In the Aragon robbery, Young drove Thomas's rental car. In the Ben-Meir robbery she used her own vehicle. Young not only knew that Thomas would use a loaded shotgun in the Ben-Meir robbery, she helped him procure the gun by driving Thomas to Mama Pat's to pick it up.

By the time of the Ben-Meir robbery, Young was not only aware of Thomas's propensity for violence through her godmother and the violent incident with a neighbor that she herself

33

witnessed—she now knew that Thomas had shot Aragon (likely fatally) in the earlier robbery.

Young was present at the robbery and saw Thomas standing over Ben-Meir, who was first on his knees and then face-down on the ground with his hands up. Despite knowing that Thomas shot and likely killed their last victim, Young did nothing to try to dissuade Thomas when she saw him standing over a helpless Ben-Meir with the shotgun. She did not tell Thomas they should leave or drive her own car away from the scene. After she heard the gunshot and looked back to see Ben-Meir lying motionless on the pavement, Young did not try to aid him or call 9-1-1.

Substantial evidence supports the trial court's finding that Young was a major participant in the Ben-Meir robbery.

b.      *Reckless Indifference to Human Life*

As with the major participant analysis, the reckless indifference factors that were present in the Aragon robbery were also present in the robbery of Ben-Meir, so we detail only the additional evidence that supports the trial court's finding.

In addition to knowing that Thomas was using a loaded shotgun to rob Ben-Meir, Young knew Thomas was likely to use lethal force in the robbery, because Thomas shot Aragon only eight days earlier.

Thomas's robbery of Ben-Meir involved clear steps in escalation—the two men first struggled, then Ben-Meir went down on his knees, and finally Ben-Meir lay flat on the ground with his hands up. It was however, still brief, so we cannot say that the duration of the robbery placed Ben-Meir at greater risk.

Young failed to make any effort to minimize the violence in the Ben-Meir robbery. Her failure was particularly significant in the wake of the Aragon shooting. Young knew that the circumstances were similar—it was night, Ben-Meir was isolated, and Thomas was again armed with a loaded shotgun that he had demonstrated he would use—yet she did not insist that Thomas unload his gun or take some other precaution that would prevent another shooting.

As with the Aragon robbery, Young stayed on the scene but made no attempt to encourage Thomas to leave and extricate herself from the situation or to otherwise restrain his violence. Young had already experienced a preview of events by the time of the Ben-Meir robbery. Young could have anticipated that Thomas would shoot Ben-Meir if Ben-Meir resisted. If Young intended to avoid further violence she would have done something to restrain Thomas or to aid Ben-Meir when she saw the men struggling. She did not.

Young's behavior before and after the Ben-Meir robbery also evidences her reckless indifference to human life—Young had participated in the robbery in which Thomas shot Aragon only eight days earlier, yet she did not hesitate to assist Thomas in a second armed robbery. After Thomas shot and killed Ben-Meir, Young continued to commit armed robberies with him. As she told authorities, she wanted to spend time with Thomas and she was willing to turn a blind eye to the fact that Thomas was shooting and killing people in order to continue the relationship. She did not consider refusing to participate in the robberies.

35

### c.    *Totality of the Circumstances*

The totality of the circumstances support the trial court's finding of reckless indifference.  As in the Aragon robbery and murder, Young knew that Thomas was armed with a loaded shotgun and that he had a history of violence.  She knew that Thomas was capable of shooting a victim and potentially killing that victim to commit a robbery.  Young took no steps to minimize the chance of violence and again assisted in the robbery of an isolated individual at night.  Young saw Ben-Meir struggle with Thomas, go down on his knees, and then lie flat on the pavement.  She knew Ben-Meir was vulnerable, yet did not say anything to Thomas or drive away in her own car.  After the shooting, Young saw that Ben-Meir remained motionless on the ground but she did not attempt to help him.  Instead, she continued committing armed robberies with Thomas until they were finally arrested.

Substantial evidence supports the trial court's findings that Young was a major participant who acted with reckless indifference to human life in the Ben-Meir robbery, and was therefore ineligible for relief under section 1172.6.

## DISPOSITION

We affirm the trial court's order denying Young's section 1172.6 petition.

NOT TO BE PUBLISHED.


MOOR, J.

I CONCUR:


KIM (D.), J.

The People v. Destiny Young
B331830


BAKER, Acting P. J., Concurring in Part and Dissenting in Part


We find ourselves in the same place we were before our Supreme Court granted review and ordered this court to vacate its prior opinion and reconsider the cause in light of *People v. Emanuel* (2025) 17 Cal.5th 867.  In that prior opinion, I agreed with the majority that substantial evidence supported the trial court's ruling that defendant and appellant Destiny Young (defendant) was ineligible for Penal Code section 1172.6 relief in connection with her conviction for the voluntary manslaughter of Gabriel Ben-Meir.  I did not agree, however, with the majority's holding that sufficient evidence supported the trial court's ruling that defendant was foreclosed from obtaining Penal Code section 1172.6 relief on her conviction for the earlier voluntary manslaughter of Marcelo Aragon (Aragon).

Our Supreme Court's recent guidance in *Emanuel* only reinforces the correctness of my earlier-expressed view.  The majority concludes otherwise by getting lost in the trees (what with its musings about bulky shotguns) and missing the forest; in *Emanuel*'s words, by allowing "[t]he nonexhaustive list of factors identified as relevant to the reckless indifference inquiry . . . [to] supplant the standard they are meant to elucidate." (*Emanuel*, *supra*, 17 Cal.5th at 896.)  As the majority concedes, defendant was a "lookout and getaway driver," and we have uncontested direct evidence of her mental state at the time of the planned

Aragon robbery that the majority relegates to a footnote: she hoped no one would get hurt—and did not think anyone would get hurt—even though she knew someone "possibly" might. This mental state does not foreclose section 1172.6 relief for the Aragon killing.[1] (*Emanuel*, *supra*, at 884 ["As the United States Supreme Court has acknowledged, "'the possibility of bloodshed is inherent in the commission of any violent felony,'" such that one who perpetrates or attempts to perpetrate such a crime may well anticipate 'the use of lethal force as a possibility'"]; *ibid.* [""Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient" to establish reckless indifference to human life; "only knowingly creating a 'grave risk of death'" satisfies the statutory requirement'"]; *ibid.* ["participation in a "'garden-variety armed robbery,'" i.e., one in which the only factor supporting a reckless indifference finding is that a participant was armed with a gun, is insufficient without more to establish reckless indifference"].)

---

[1] The majority says the direct evidence of defendant's mental state "does not assist her" because she "knew that the robbery had a real potential to include a shooting but decided to participate despite the serious risk to human life that a shooting would pose." That is fundamentally wrong in two separate ways. First, it is not enough to say defendant knew that the robbery had "a real potential" (which is just alternate phrasing for "possibility") to include a shooting. All armed robberies do, and as the excerpts from *Emanuel* that I quote demonstrate, that is not enough. (*Emanuel*, *supra*, 17 Cal.5th at 884.) Second, it is of course true that just about all shootings pose serious risks to human life; that is the nature of the weapon. Saying so has no analytical significance. The right question is whether defendant knowingly created a grave risk of death in the planned Aragon robbery. (*Ibid.*) There is no substantial evidence she did.

2

Only after Jabaar Thomas, the actual killer, shot Aragon can defendant be said to have understood he was not just a reported domestic abuser but someone who posed a grave risk of using lethal force.  It was only at that point that she was recklessly indifferent to human life by continuing to participate in robberies with him.  (*Emanuel*, *supra*, 17 Cal.5th at 883 "'[r]eckless indifference to human life is "implicit in knowingly engaging in criminal activities known to carry a grave risk of death"'"]; *id.* at 884 ["""[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed," and he or she must consciously disregard "the significant risk of death his or her actions create"'"].)


BAKER, Acting P. J.